**TRAVELERS PERSONAL SECURITY INSURANCE COMPANY,**
Appellant,

v.

**Douglas and Rosalind McCLELLAND,**
Appellees,

**Douglas and Rosalind McClelland,**
Appellants,

v.

**Travelers Personal Security Insurance Company, Appellee.**

No. 01–05–00093–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 19, 2006.

---

8. We reach this challenge as an alternate basis upon which judgment could have been rendered for RKL.

Eva C. Ramos, J. Hampton Skelton, Skelton & Woody, Austin, John Chadwick Gauntt, Gauntt & Kruppstadt, L.L.P., The Woodlands, for appellant.

Paul E. Anderson Jr., James B. Lewis, Robert Wayne Hildebrand, Jason R. Bernhardt, Miller, Lewis & Davenport, P.C., Houston, for appellees.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

SAM NUCHIA, Justice.

After Travelers Personal Security Insurance Company ("Travelers") denied Douglas and Rosalind McClelland's ("the McClellands") claim, the McClellands filed suit alleging violations of the Texas Insurance Code, the Deceptive Trade Practices Act, and common law breach of contract. The jury returned a verdict, finding that plumbing leaks, which were covered under the McClellands' insurance policy, had caused eighty percent of the damage to the McClellands' home. The trial court entered judgment for damages from the breach-of-contract violation, but granted Travelers' Motion for Judgment Notwithstanding the Verdict in part, entering judgment disregarding the jury's verdict awarding additional damages to the McClellands based on the jury's finding that Travelers had violated the Insurance Code by knowingly engaging in unfair or deceptive conduct. Travelers appeals from the breach-of-contract damage award, and the McClellands appeal the trial court's partial granting of the Motion for Judgment Notwithstanding the Verdict. We affirm the judgment of the trial court.

## BACKGROUND

In the summer of 2000, the McClellands began to notice structural problems with their house due to movement of the foundation and thereafter submitted an insurance claim with Travelers. The insurance policy the McClellands owned excluded coverage for foundation damage due to "natural causes"; however, an exception to this exclusion covered the resulting damage from foundation movement due to plumbing leaks.

A leak detection test was performed and revealed plumbing leaks under the foundation. Travelers then hired Jerry Jackson, a structural engineer, to ascertain whether these leaks were the cause of the foundation damage to the McClellands' home. Jackson concluded that the damage to the house was not due to the plumbing leaks, and, based on this report, Travelers denied the McClellands' claim.[1] Peter de la

---

1. Jackson's report concluded that the foundation movement was primarily caused by loss of moisture in the soil underneath the founda-

Mora, the McClellands' expert, found that the plumbing leaks were the cause of the foundation movement and the resulting damage. While conceding that natural causes were part of the problem, de la Mora testified that the plumbing leak triggered the movement causing the damage to the house.

## LEGAL SUFFICIENCY OF THE EVIDENCE

Travelers' sole issue is that the evidence is legally insufficient to support the jury's verdict that eighty percent of appellees' damages was attributable to the plumbing leaks.

## STANDARD OF REVIEW

In *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005), the supreme court concluded, "the final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review ... [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.*

When reviewing a no-evidence point of error, "all the record evidence must be considered in the light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp., v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998).

## DISCUSSION

■ Travelers' argument, and the resolution of its appeal, rests on its construction, soil subsidence, and soil drying and

tion, in the context of insurance coverage, of the concurrent causation doctrine. The Texas Supreme Court has said that it is "well-settled in Texas" that if an insurer pleads an "exclusion under the policy" the "insureds [are] obligated to introduce evidence to prove and secure jury findings that damage was caused solely by the [covered risk]; *or* segre[gate] the damage caused by the insured peril from that caused by ... an excluded peril." *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 162 (Tex.1971) (emphasis added). The *McKillip* Court stated, "It is essential that the insured produce evidence which will afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Id.* at 163 (citing *Paulson v. Fire Ins. Exch.*, 393 S.W.2d 316 (Tex.1965)). In 1997, the court reiterated its commitment to the principles espoused in these cases in *Texarkana Memorial Hospital, Inc. v. Murdock*, 946 S.W.2d 836, 840 (Tex.1997) (reaffirming the holdings in *McKillip* and *Paulson* ). Given this, the specific issue for us to resolve here is whether the McClellands placed before the jury more than a scintilla of evidence segregating the damage caused by plumbing leaks versus the damage incurred by natural causes such that the evidence was legally sufficient to support the jury's finding that eighty percent of the damages was attributable to the plumbing leaks.

At trial, de la Mora, testified as follows:

Q: In 1995, when [The McClellands] purchased this home, can you tell me what this engineer found as far as whether the foundation was performing as it should perform?

A: I believe that he found that the foundation was performing as it should perform.

shrinking.

Q: Did he find the house to be relatively level?

A: I would say so. He didn't find much evidence of movement in the way of cracks. I believe that he said there were some cracks in the left or right-handside—I don't remember exactly right now—along the rear.

Q: Okay. In fact, the only thing he found were a couple of hairline cracks in the exterior brick veneer. Do you recall that?

A: I think so. That's right.

\* \* \*

Q: What's the significance of having a 30–year–old home—that we know at least in 1995 was relatively flat, the foundation's performing—why is that significant to you in doing a forensic evaluation of this case?

A: Well, when houses get older and as foundations get older, they stop moving. They don't move as much as when they're newer. Most of the movement of a foundation occurs—and I'm talking from natural causes—in the first 15 years or so. After that it kind of sets. And unless something happens out of the ordinary, that foundation is just going to stay there.

\* \* \*

Q: ... What does that '95 report tell you about the ability of this home to withstand the influence of drought and trees and things of that nature?

A: It tells me that it's performing okay, that it has withstood the effects of the trees and vegetation and drainage and all those naturally occurring movements.

\* \* \*

Q: And was this [plumbing] leak identified by Church [Services] near a [pipe] fitting of some sort?

A: Yes, it was.

\* \* \*

Q: ... Or what's your opinion, I guess, as it relates to the plumbing leaks versus you talked about drainage, you talked about just the normal settlement that occurs in an old home?

A: Right. Well, the home needs to be repaired because it has moved too much. And that movement has been partly caused by the plumbing leak, partly by other natural conditions that affect it.

Q: Okay. Do you know anything about, since this home in '95 was described as being relatively flat by an engineer, tell me how it is that these natural causes, why they would only manifest themselves in 2000? Or maybe they didn't. I don't know.

A: No. These natural causes have been affecting this house since the day it was built.

Q: But why weren't they seeing cracks all over the place?

A: Well, because the—there has to be other effect that triggers the movement. Again, the house has been sitting around for 25, 30 years. It's not just all of a sudden going to start moving unless something is introduced that causes a change in the way the foundation is supported.

Q: Well, is there anything other than plumbing leaks that's new in the equation over the lifetime, the 35 years of this home?

A: No, not that I'm aware of. Because over the lifetime this house has seen already droughts before this period, and a lot of changes in climate from wet to dry. So—

Q: All right.

Finally, the McClellands introduced into evidence a diagram prepared by de la Mora showing the house and the portion of it he believed to be directly affected by the plumbing leaks. De la Mora testified that

"the red hashed part that's in that diagram is the area we believe the plumbing leaks have affected the house."

De la Mora's testimony showed that the engineer who initially inspected the home when the McClellands first purchased it found that the foundation was "performing as it should." It further showed that, while natural causes, such as drainage and vegetation influenced the movement of the foundation, such causes would only substantially affect foundation movement for the first fifteen years of its life unless an additional factor is added to the equation. De la Mora's opinion—and both parties agreed that there were plumbing leaks, and that those leaks had been discovered in 2000—was that the plumbing leaks were the trigger in causing the foundation's recent dramatic movement. Lastly, de la Mora's diagram specifically showed the area of the house he believed to be affected by plumbing leaks.

Using the requisite paradigm from *McKillip*—whether the insured segregated damages to sufficiently separate the insured peril from that caused by an excluded peril—the jury was entitled to infer that the damages to the McClellands' home were due, at least in large part, to the introduction of the covered risk, namely, the plumbing leak. *See McKillip*, 469 S.W.2d at 162. That is, the jury could have found that the insured peril was sufficiently segregated from the excluded peril based on de la Mora's testimony that the McClellands's foundation only began to move (to the extent that it caused damage to the house) once the plumbing leaks began, and his diagram showing where "the plumbing leaks have affected in the house."

Travelers central argument relies heavily on its interpretation of *State Farm v. Rodriguez*, 88 S.W.3d 313, 321 (Tex.App.-San Antonio 1999, pet. den'd). In that case, the San Antonio Court of Appeals interpreted the doctrine of concurrent causation to limit an insured's recovery to the amount of damage caused solely by the covered peril. *Id.* (citing *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 302–03 (Tex.App.-San Antonio, 2002 pet. denied)). The court went on to say that, because an insured can recover only for covered events, the onus of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof. *Id.* "To this end," the court continued, "the *insured must present some evidence upon which the jury can allocate the damage attributable to the covered peril.*" *Id.* (emphasis added). "Although a plaintiff is not required to establish the amount of his damages with mathematical precision, there must be some reasonable basis upon which the jury's finding rests." *Id.*

■■■■ Travelers would have this court hold that *Rodriguez* requires plaintiffs in an insurance case to explicitly state what damage is "solely attributable" to the covered cause. This is not what *Rodriguez* says; it only requires that there is some evidence that provides a reasonable basis for the jury's findings. *Id.* at 321. In addition, the supreme court, in *McKillip*, explicitly stated that it is "essential that the insured produce evidence which will afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *McKillip*, 469 S.W.2d at 163. While it is true that de la Mora appeared to backtrack on cross-examination, it is the province of the jury to "believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 774–75 (Tex.2003). Given this, looking at all the evidence, as we must, in the light most favorable to the verdict, we hold

that de la Mora's testimony and diagram amount to more than a scintilla of evidence providing a reasonable basis upon which the jury could have found that eighty percent of the damage to the house was due to plumbing leaks.[2] Accordingly, we overrule Travelers' sole point of error.

## JUDGMENT NOTWITHSTANDING THE VERDICT

The McClellands appeal the trial court's partial grant of Travelers' motion for judgment notwithstanding the verdict, overturning the jury's finding that Travelers had violated the Insurance Code by knowingly engaging in unfair or deceptive conduct, giving rise to additional damages.

## STANDARD OF REVIEW

The standard of review for a judgment notwithstanding the verdict is the same as a directed verdict. *Rush v. Barrios*, 56 S.W.3d 88, 94 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (citing *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990)). We will affirm a judgment notwithstanding the verdict only if there is no evidence to support an issue, or conversely, if the evidence establishes an issue as a matter of law. *Id.* (citation omitted).

The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). We review the evidence in the light most favorable to the verdict to determine whether there is more than a scintilla of evidence to support the jury's finding. *Merrell Dow Pharm., Inc.*, 953

S.W.2d at 711; *Formosa Plastics Corp.*, 960 S.W.2d at 48.

## DISCUSSION

 Under article 21.21 of the Insurance Code, an insurer violates its duty of good faith and fair dealing by denying or delaying payment of a claim when the insurer knew or should have known that it was reasonably clear that the claim was covered. TEX. INS.CODE ANN. art. 21.21 (Vernon 2005); *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55–56 (Tex.1997). Evidence showing only a bona fide coverage dispute does not, standing alone, demonstrate bad faith. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex.1997). However, an insurer cannot shield itself from bad-faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denying a claim. *See id.* (insurer's reliance on biased engineer's report was pretext for denying claim).

 Therefore, the specific issue for us to consider on appeal is whether, in reviewing all the evidence in the light most favorable to the McClellands, there is more than a scintilla of evidence to support the jury's finding that Travelers violated article 21.21 of the Insurance Code by knowingly engaging in unfair or deceptive conduct in denying the McClellands' claim.

The touchstone case for bad-faith insurance claims is *State Farm v. Nicolau*, and it therefore warrants a detailed discussion. In that case, the Nicolaus' house had sustained significant damage, and they hired an engineer to investigate the cause. After he determined that "there was a signif-

---

2. Travelers also looks to *Utica National Insurance Company of Texas v. American Indemnity Company* for support. 141 S.W.3d 198, 204 (Tex.2004). In that case, the supreme court held that in cases of concurrent causation there can be no recovery by an insured unless the two causes are separated. *Id.* However,

as elucidated above, the McClellands did carry the burden of proof, via de la Mora's testimony and diagram, to sufficiently separate the causes of the damage to the foundation. Therefore, *Utica National* supports, rather than precludes, our holding today. 141 S.W.3d at 204.

icant leak in the plumbing system," the Nicolaus filed a claim with State Farm. *Id.* at 447. The insurance company commissioned two reports by its own hired adjusters, both of which "expressed doubt[ ] that the leak was responsible for the foundation damages." *Id.* In response, the Nicolaus gave State Farm the report from their engineer that plumbing leaks were the culprit for the damage to the house.

Thereafter, State Farm hired, via an insurance adjuster, Haag Engineering to examine the Nicolaus' home. After receiving Haag Engineering's report finding no connection between the plumbing leaks and the damage to the house, State Farm denied most of the coverage sought. The Nicolaus then hired another firm with a background in geotechnical engineering, which also found that plumbing leaks were the source of the problem. Upon receipt of this second report, they forwarded it to State Farm, who again denied their claim. The Nicolaus then filed suit against State Farm.

The supreme court, in considering a no-evidence issue, determined that the Nicolaus had put forth some evidence "that State Farm denied the claim without . . . attempting to objectively determine whether its liability had become reasonably clear." *Id.* at 448. That evidence was that the Haag engineer (1) worked almost exclusively for insurance companies; (2) was aware that plumbing leaks would cause the insurer to incur liability; and (3) nearly exclusively found no liability for the insurer. In addition, the evidence supported a "logical inference that State Farm obtained the reports from Haag Engineering because of Haag's general view that

plumbing leaks are unlikely to cause foundation damage." *See id.* (quoting testimony from State Farm's claim superintendent that he knew before he hired Haag that Haag's general opinion was that localized leaks underneath a house would not cause foundation damage).

There was also evidence that State Farm, and the engineers on which it relied, did not conduct an adequate investigation. *Id.* at 449. A licensed insurance adjustor testified that State Farm's failure to examine the leaking pipe, take core samples, and perform other tests amounted to an unreasonable investigation. *Id.* Finally, the Nicolaus' repair contractor, who had reviewed nearly a hundred Haag reports, knew of only two instances in which it had found plumbing leaks to have been the cause of foundation damage to a home, and "even State Farm's own expert . . . testified that he disagreed with [some of Haag's conclusions]." *Id.* at 450.

To be sure, the instant case presents us with a close call. The McClellands' evidence adduced at trial, like that found in *Nicolau*, established that Travelers' engineer Jackson worked almost exclusively for insurance companies, knew that plumbing leaks were covered under the insurance policy, and found no connection between plumbing leaks and foundation problems eighty-five to ninety percent of the time. Their evidence also allowed for the logical inference that Travelers hired Phoenix Engineering, the firm that Jackson worked for, because Phoenix consistently found no connection between plumbing leaks and foundation damage.[3]

---

3. The parties disagree as to what the record shows on this point based on Jackson's testimony. However, the record is clear that Travelers consistently hired Jackson's firm, Phoenix Engineering, and that Travelers considered these reports in determining whether coverage existed. This fact, read in conjunc-

tion with the fact that the vast majority of the time Jackson found no coverage—causing events, will yield the inference—again viewed in the light most favorable to the verdict—that Travelers was aware of Phoenix's dim view of plumbing leaks as a cause foundation damage.

However, as the supreme court in *Nicolau* stated, "[s]tanding alone, this [type of] evidence would not always be evidence of bad faith. All experts presumably have certain general views and expertise, and an insurer's mere awareness of such views is not necessarily an indication of bad faith." *Id.* at 449. That is, the supreme court seems to require that, in order to show bad faith, the evidence must show behavior more egregious than merely hiring a firm whose reports generally feature an outcome favored by its recipient. *Id.*

We cannot say that the evidence shows bad faith. While the depth of the investigation into the plumbing leaks was an issue in *Nicolau,* and the McClellands attempt to make it such here, the testimony of each expert as to the extent of his investigation was essentially the same: both experts' investigations consisted in large part of documenting the damage to the house and measuring the elevations in various parts of the house. In addition, both Douglas and Rosalind McClelland testified that they believed that Travelers had not set out to deny their claim, and that the dispute was based on "an honest dispute between two engineers." And this is the key fact: while both sides hired experts who came to differing conclusions as to the cause of the foundation damage, the McClellands' expert himself repeatedly testified that natural causes had combined with the plumbing leaks to cause the damage to the house.

Evidence that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 17 (Tex.1994). Nor is bad faith established if the evidence shows the insurer was merely incorrect about the factual basis for its denial of the claim, or about the proper construction of the policy. *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 601 (Tex.1993) ("[T]he is-

sue of bad faith focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct in rejecting the claim."). A simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith. *Id.* To the contrary, an insured claiming bad faith must prove that the insurer had no reasonable basis for denying or delaying payment of the claim, and that the insured knew or should have known that fact. *See Moriel,* 879 S.W.2d at 18.

Looking at "all the evidence in the light most favorable to the verdict," given that the McClellands' own expert could not unequivocally state that it was plumbing leaks, and plumbing leaks alone, that were the cause of the foundation damage (thereby leaving the inference that the cause of the damage was not immediately reasonably clear), and that the McClellands can marshal no more evidence than Travelers' proclivity to hire an expert of its own preference, the evidence will only bear the conclusion that this was a "simple disagreement among experts about whether the cause of the loss is one covered by the policy, [and] will not support a judgment for bad faith." *Id.* at 18.

We hold that, in looking at all the evidence in the light most favorable to the verdict, the evidence is legally insufficient to support the jury's finding of additional damages. Accordingly, we overrule the McClellands' sole point of error.

## CONCLUSION

We affirm the judgment of the trial court in all respects.