

# NUMBER 13-20-00425-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

TEXAS WINDSTORM
INSURANCE ASSOCIATION,                                    Appellant,

v.

COMMERCE OFFICE
PARK-ONE, L.P.,                                          Appellee.

## ON APPEAL FROM THE 105TH DISTRICT COURT
## OF NUECES COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña**
**Memorandum Opinion by Justice Tijerina**

Appellant Texas Windstorm Insurance Association (TWIA) appeals the jury's

verdict awarding monetary damages to appellee Commerce Office Park-One, L.P.

(Commerce).[1] By four issues and multiple sub-issues, TWIA contends that: (1) the evidence is legally and factually insufficient to support the findings that (a) damage to the buildings' roofs resulted from the wind as opposed to other causes such as wear and tear and (b) "the roofs were a total loss"; (2) the trial court made numerous erroneous evidentiary rulings that were individually and collectively harmful to TWIA; (3) the trial court submitted erroneous questions to the jury; and (4) Commerce is only entitled to an award of the actual cash value damages. We affirm.[2]

## I. SUFFICIENCY OF THE EVIDENCE

By its first issue, TWIA contends that Commerce failed to prove by legally and factually sufficient evidence that (1) the damage to its two buildings were caused directly by the wind, (2) damage to the roofs was not caused by "excluded perils such as wind-driven rain, wear and tear, and deterioration," and (3) the roofs were a total loss. Commerce responds that there is sufficient evidence to support the jury's findings.

## A. Standard of Review

A "no evidence" or legal insufficiency point is a question of law challenging the

---

[1] Commerce sued TWIA for mishandling its claim pursuant to Texas Insurance Code §§ 2210.575–576 and for breach of contract. *See* TEX. INS. CODE ANN. §§ 2210.575–576. Commerce's suit is based on TWIA's alleged improper denial of its insurance claim filed after Hurricane Harvey damaged the roofs on two of Commerce's buildings.

[2] We abated this case on June 12, 2023, in light of this Court's decision in *Pruski v. Texas Windstorm Ins. Association*, 667 S.W.3d 460 (Tex. App.—Corpus Christi–Edinburg 2023) rev'd and remanded, *Tex. Windstorm Ins. Ass'n v. Pruski*, No. 23-0447, ___ S.W.3d ___, ___, 2024 WL 2096557, at *1 (Tex. May 10, 2024), wherein, we determined that a trial court lacks jurisdiction in actions against TWIA, if the presiding judge is not appointed by the Judicial Panel on Multidistrict Litigation ("MDL Panel") and any order or judgment entered is "void." *Id.* at 466-67. Subsequently, the Texas Supreme Court reversed this Court's holding in *Pruski* concluding that a complaint that the MDL Panel did not appoint the judge in a suit against TWIA is not jurisdictional, and we reinstated this cause. *Tex. Windstorm Ins. Ass'n*, 2024 WL 2096557, at *4. Here, neither TWIA nor Commerce complained in the trial court that the MDL Panel had not appointed the judge. Therefore, we conclude that the trial court had jurisdiction. *See id.*

2

sufficiency of the evidence to support a particular fact finding. *In re Estate of Livingston*, 999 S.W.2d 874, 879 (Tex. App.—El Paso 1999, no pet.). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id*. at 821–22, 827. If the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the factfinder. *Id.* at 822.

A no-evidence point will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *see City of Keller*, 168 S.W.3d at 810. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact, and the legal effect is that there is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

In reviewing a factual-sufficiency challenge to a finding on an issue on which the appellant did not have the burden of proof, we will set aside the verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We examine the entire

3

record, considering both the evidence in favor of, and contrary to, the challenged finding in our factual sufficiency review. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We must weigh all the evidence, not just that evidence which supports the verdict. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Mar. Overseas Corp.*, 971 S.W.2d at 406–07. If we determine that the evidence is factually insufficient to support the jury's findings, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem. Co.*, 46 S.W.3d at 242. The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Whether reviewing the legal or factual sufficiency of the evidence, the jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. We must show deference to the jury's resolution of conflicts in the evidence, and we must presume that the jury resolved all conflicts in favor of the verdict. *Id.* at 820–21. We may not substitute our own judgment for that of the jury, even if we would reach a different answer based on the evidence. *GTE Mobilnet of S. Tex. Ltd. P'ship*, 61 S.W.3d at 616 (citing *Mar. Overseas Corp.*, 971 S.W.2d at 407).

## B.    Pertinent Facts

Peter Kavoian owns Commerce and its buildings, which were built in the early 1970s and includes two single-story buildings that are located next to each other. Kavoian

bought the buildings in 1994. The buildings have business tenants including, among other types, accountants, doctors, and construction companies. According to Kavoian, the prior owner "opted to put a brand[-]new roof on [both] building[s] before [he] bought [them]." Kavoian testified that although the "bulk of the work" on installing the new roofs had been completed by the time he arrived on site prior to closing, he recalled seeing the roofers "wrapping up" the work. Kavoian hired a local inspector to inspect the buildings prior to purchasing them. According to Kavoian, the inspector did not locate any structural problems to the buildings. Kavoian stated that the inspector commented that the roof "was a class[-]A roof, perfect roof." Kavoian testified that as he understood it, with regular maintenance, the roof would have lasted for fifty years.

Kavoian does not maintain the properties. Ramon Flores Jr. was the full-time daily maintenance man since 2010, and he made repairs or hired someone else to make repairs when he could not. At the time of trial, Sharon Endres was the current site manager, who tenants could call with complaints and who would then create a work order for Flores. Once provided with a work order, Flores inspected the issue and reported the work that was done. Flores ensured proper completion prior to paying outside contractors who made repairs to the buildings.

Evidence was presented that the roofs were composed of three layers of fiberglass membrane each embedded in tar, with broadcast pea gravel that was underneath lightweight concrete and metal decking and were low sloped via tapered concrete. Underneath the decking there was framing, insulation, ceiling tiles, air conditioning refrigerant, and conduit lines that ran from the roof with water pipes in the open areas.

5

The evidence showed that, prior to Hurricane Harvey there was no regular roof inspection and maintenance schedule. Instead, Flores determined whether there were any leaks by observing ceiling tiles and the source of the leaks and by removing the tiles that appeared wet or stained. Flores patched any penetrations with roof tar and cement. Flores testified that he inspected the patches he filled after it rained to determine whether a leak still existed. When Flores determined that a leak persisted, he called the roofer, B. Ramirez Roofing.

Kavoian testified that all properties leak, but there were no "systemic" roof leak problems to any of the buildings prior to Hurricane Harvey. According to Kavoian, any issues of leaking were resolved at the time the issue arose. Flores could not recall any "major issues with the roofs" prior to Hurricane Harvey that could not be repaired.

Butch Ramirez testified that his business, B. Ramirez Roofing, has performed residential and commercial roofing in Corpus Christi, Texas, since the 1970s. According to Ramirez, the roofs of Commerce's buildings had been properly maintained, included leak repairs and gravel replacement. Ramirez replied, "Yes," when Commerce asked, "And when you recommended that some work be done on the roofing system, would they do it?" Ramirez could not recall any instance when Commerce did not follow his recommendation for necessary roof work. He stated that regarding maintenance of the roofs, "Everything was done. Everything was done accordingly. They never . . . denied the fact not to do it, not to do the repairs." Ramirez testified that he did not believe that Commerce ever waited until the last minute to perform any roof repairs.

Ramirez said that pooling or ponding of water after it rains is not automatically a

problem on a roof, unless the water stays on the roof for over forty-eight hours. According to Ramirez, prior to Hurricane Harvey, he had repaired one area on one of the building's roofs where the water was pooling by "flood[ing] it with hot asphalt, and then gravel[ing] the area," which raised that area so that the water could run off the roof. Ramirez testified that other than this area, he could not "think of any [other] problems with water standing on the roof" prior to Hurricane Harvey. Ramirez stated that if he had observed other standing water issues on the roofs, he would have repaired them. Ramirez did not believe that there were any areas of the roofs prior to Hurricane Harvey where there was not enough gravel over the membrane. Ramirez testified that when he went to Commerce's buildings, his purpose was to "repair the . . . problems that they're having on leaks, pitch pans, penetrations," and he always successfully made those repairs. Ramirez reiterated that every time he went to Commerce's buildings, he "was able to take care of the problem."

Ramirez testified that prior to Hurricane Harvey, the "[o]verall condition of the roof" was "good," and he had never observed any soft spots on the roof when walking on it. After Hurricane Harvey, Ramirez went to the buildings, and he saw "penetrations" that he attributed to "something that hit the roof and created . . . a hole." Commerce asked, "[B]ased on your personal observations of these roofs before and after Hurricane Harvey and your experience as a roofer, do you believe that wind and debris from Hurricane Harvey caused significant damage to these roofs?" Ramirez replied, "Yes." Ramirez stated that he did not recall seeing any "major problems" or "major gouges or cuts" in the roofs that had not been repaired prior to Hurricane Harvey. Ramirez testified that after

7

Hurricane Harvey, he made repairs due to "objects penetrat[ing] the roof and there [were] some holes on the roof" that he repaired.

On cross-examination by TWIA, TWIA asked Ramirez to identify water ponding on Commerce's roofs in pictures shown to him. However, Ramirez testified that it is difficult to ascertain whether water has been ponding on a roof based on a picture. He said that to make such a determination, "you actually have to physically be out there." Ramirez explained, "I can pinpoint all the dark areas, but not necessarily that all of those are ponding." Ramirez hypothesized that the dark areas in the pictures shown to him by TWIA could simply be depictions of the asphalt. Ramirez agreed with TWIA that in some of the pictures shown, there was ponding of water and there was grass growing, which indicated ponding. On redirect examination by Commerce, Ramirez agreed that he was unaware of how long the water had been on the roof at the time that the pictures were taken.

Kelly Urbanec, TWIA's corporate representative, testified that upon an application for a wind-storm policy, TWIA can inspect the property. According to Urbanec, when Commerce applied for a wind-storm policy on April 25, 2012, TWIA inspected the roofs and reported that the roofs were ten to fifteen years old and in good condition. According to Urbanec, prior to renewing a policy, TWIA may require that the policy holder make necessary repairs to the roof, but Urbanec stated that although TWIA had renewed Commerce's policy on a yearly basis, TWIA had never requested Commerce to make roof repairs. Urbanec explained that generally, if there is a condition "that needs repair," TWIA's underwriting department notifies the "policyholder saying, please document repair of X, Y, [Z] items, wherever it is, missing shingles on the roof on a house, and provide us

8

documentation, invoices that you've completed that, and that's how they address that." TWIA had insured the two buildings from 2014 to 2019 without asking for repairs.

Urbanec testified that coverage on the policy included replacement cost value, actual cash value, and special coverage of increased cost of construction for compliance with codes during replacement. Urbanec agreed with Commerce that one calculates the actual cash value by establishing the replacement cost and then "subtract[ing] the depreciation on the replacement cost." Urbanec said, "Whoever writes up the estimate would figure 'Replacement Cost Value.' They would figure the depreciation and then they would also figure the Actual Cash Value or whatever those damages are." Urbanec clarified that TWIA would pay actual cash value if there were repairs made that cost more, and TWIA reimburses the withheld depreciation up to the replacement cost value. According to Urbanec, the actual cash value payment ensures that the work of replacing the roof can begin.

Urbanec testified that on September 26, 2017, Commerce notified TWIA of its claim. After inspecting the property, TWIA accepted Commerce's claim in part and denied it in part. Urbanec agreed with Commerce that TWIA followed the policy's requirement of notifying Commerce within sixty days of its decision by sending a letter to Commerce, on October 14, 2017. The letter acknowledges that TWIA received notice of Commerce's claim on September 26, 2017, and that Commerce suffered "[w]ind damage to the building's roof system. . . ." The letter states that TWIA accepted the claim in part and denied it in part. TWIA denied coverage for damage to a fence.

Specifically, the letter states that "TWIA accepts the damages as summarized" as

follows: (1) building one—wind damage to the building's roof system, broken glass, and "interior water intrusions to various suites causing water damage to ceilings, walls, and floors"; (2) building two—wind damage to the roof, broken glass, and "interior water intrusions to various suites causing water damage to ceilings, walls, and floors." However, according to the letter, the monetary damage incurred was below the deductible for both buildings; therefore, no loss payment applied. The letter also denied the claim in part for wind damage to an outdoor wooden fence and exterior light fixtures and poles because those items were not listed in the policy.

Urbanec testified that under the applicable policy, Commerce had the right to invoke the appraisal process if it disagreed with the amount found by TWIA. According to Urbanec, the appraisal decision is binding on both TWIA and Commerce. Urbanec explained that under the policy, appraisal is not available when TWIA fully denies a claim, and appraisal only applies in situations like here where TWIA has either completely accepted the claim or partially accepted the claim. Urbanec agreed with Commerce that TWIA had accepted coverage for the roofs. Urbanec also agreed that the deadline for TWIA to have accepted or denied Commerce's claim was November 26, 2017.

After TWIA sent the October 14, 2017 acceptance letter to Commerce, Commerce invoked the appraisal process. Urbanec testified that the appraisal was set for January 10, 2018. TWIA then sent a letter to Commerce requesting a reinspection of the property in lieu of the appraisal. The letter states, "The appraisal process will be formally *evaded* or *postponed* on this claim until such time that the reinspection's been completed." (Emphasis added). Urbanec explained that if Commerce had refused the reinspection,

the appraisal would have been done, and TWIA would have "said, okay." Commerce agreed to a reinspection. Urbanec acknowledged that in its letter requesting reinspection, Commerce was informed that if the disagreement was not resolved after reinspection, an appraisal would follow.

However, after reinspection TWIA completely denied Commerce's claim by letter on July 20, 2018, and denied an appraisal. Urbanec conceded that July 20, 2018, was "way beyond 60 days from the date of the notice" and that the denial of Commerce's claim was made "after the decision date deadline." Urbanec also acknowledged that TWIA does not inform a policy holder that if TWIA accepts a claim and then conducts a reinspection, appraisal is no longer an available remedy if TWIA changes its disposition to a denial in full. Urbanec agreed with Commerce that this allows TWIA to change its decision to approve or deny a claim depending "on how the reinspection comes out." Urbanec acknowledged that Commerce's policy does not state that TWIA may change its disposition from acceptance to denial of the claim but maintained that the policy "doesn't provide that [TWIA] can't change either." Finally, Urbanec conceded that internal TWIA notes about Commerce's claim indicate that TWIA had concluded there had been wind damage to a wooden fence on the exterior of the property and that TWIA "accepted anterior and exterior damages to the roof."

Through Urbenec's testimony, Commerce established that TWIA asked its contractor to determine the actual cash value of replacing the roofs, and the contractor determined that the actual cash value of replacing the roofs and structural damage was

11

approximately $1.2 million with depreciation of $139,487.40.[3] Urbanec stated that she had "no reason" to dispute the pricing estimate that had been made by its contractor who had worked with TWIA on several prior occasions. Regarding the increased cost of construction, Urbanec agreed that TWIA's contractor's estimate was over $442,000. For the other building, the contractor "found an increased cost of construction [of] $303,708." Urbanec agreed that TWIA's contractor based the estimate of the replacement costs of the roofs on an assumption that the roofs had plywood sheathing as opposed to metal sheathing. Urbanec acknowledged that there is a difference in price for those two materials.

On cross-examination by TWIA, Urbanec clarified that the applicable policy prohibits payment "for loss or damage caused by or resulting from rain, whether driven by wind or not," and the policy only covers damage or loss from rain if "wind or hail first makes an opening in the walls or roof of the described building." In such cases, Urbanec clarified TWIA "will only pay for the loss . . . to the interior of the building or the insured property within [that is] caused immediately by rain entering through such openings." Urbanec said that if "[t]here is a wind created opening, we can pay for that," which cannot have been a "preexisting opening."

Regarding Commerce's buildings, Urbanec testified that she "noticed" what appeared to be areas, "whether they existed before or not," where "there was some avenue for the water to have come in or it was from around windows and doors."

---

[3] Plaintiff's Exhibit 28 is an inspection report by TWIA's contractors Tom Young and Cheyenne Homes that shows the total amount to replace the roof and to repair the structural damage would have been $763,573.18 for building one and $503,645.33 for building two.

According to Urbanec, such damage from gaps in windows and doors is indicative of "wind driven rain." TWIA showed Defendant's Exhibit 8 to Urbanec, which included pictures taken by an adjuster of Commerce's buildings' roofs. Urbanec testified that she did not see "any windstorm [damage] whatsoever in those pictures."

Urbanec stated that the October 14, 2017 letter to Commerce informed Commerce that the amount listed was only an estimate and that "[t]here's further process involved." Urbanec reiterated that the amount the letter indicated the damage to each building was below the deductible and that Commerce could not have misunderstood that TWIA was providing an estimate to replace the entire roof.

TWIA's Exhibit 6, which includes notes kept on Commerce's claim, stated that on October 16, 2017, a TWIA examiner called Commerce to inform it that there is "no wind damage found to the flat roof, but the wind caused some damages to roofing materials such as turbines and areas around the AC [which] created opening[s] to cause water intrusion to the various units." In another note, the examiner documented that she let Commerce's insurance company "know that no signs of wind or hail damage [were] noted to the gravel flat roof on this building" and that TWIA was "covering the interior water damage to the various suites or offices" that were affected. Nonetheless, the examiner found that the estimated damage did "not exceed the $44,211 deductible." Urbanec agreed with TWIA that it was Commerce's attorney who first brought up the idea of a reinspection in a letter dated January 10, 2018. Urbanec testified that on several occasions in other cases, after a reinspection, TWIA has at no charge to the policy holder "paid more money" on the claim based on a "fresh look at the evidence."

13

According to Urbanec, TWIA had an engineer from "ProNet" reinspect Commerce's property, and "[b]ased on [the engineer's] conclusions there was not any windstorm damage to the property from Hurricane Harvey." Urbanec explained that once ProNet "turned in the report," TWIA sent Commerce a letter informing it that its claim had been denied after reinspection, TWIA had "found no storm related damages to the roof or elevations of the building," and "the displace[d] turbine roof vents on the roof over both buildings occurred prior to Hurricane Harvey." Urbanec said that in a second letter explaining the denial of Commerce's claim, TWIA informed Commerce that the condition of "the H[VAC] ductwork and displaced turbine vent" existed prior to Hurricane Harvey. Thus, according to Urbanec, although the adjuster initially thought the damage had occurred due to Hurricane Harvey, "the engineer found that they were not." Urbanec explained that "with high winds, [she] wouldn't expect that lightweight PVC pipe to be there" on the roofs, which were shown in pictures. Urbanec thought these pictures supported TWIA's denial of Commerce's claim. Urbanec said that "specifically the H[VAC] ductwork that was . . . missing a cover," had been blown off by the wind; however, "aerial photography show that it preexisted."

On redirect examination by Commerce, Urbanec stated that although the October 14, 2017 letter said TWIA had accepted roof damage, that acceptance was limited to the "damage that was written specifically in [TWIA's] estimate." Urbanec acknowledged that Commerce sought a "general claim" of roof damage, TWIA had originally accepted "a small portion of that general claim," TWIA did not "deny [the claim] in the letter," and TWIA "did not find damage to the rest of the roof."

14

Vicky Geer, a former claims examiner for TWIA, testified that she wrote a May 7, 2018 denial letter to Commerce and the updated July 20, 2018 letter informing Commerce that TWIA had denied its claim. Geer agreed with Commerce that she had experience as a field adjuster "where [she] would actually climb up on buildings and take photographs and take measurements and write estimates." Geer said, "The field adjuster's job is to go out to see if there is damage and to determine that damage . . . look at the damage, report it, write an estimate for it, and turn it in." Geer clarified that as a field adjuster, she did not "determine coverage out in the field." Geer agreed with Commerce that as part of her duty as a field adjuster, she was "trying to determine the cause of the damage," which included determining "whether a property was damaged by water that was rising water like from a flood or storm surge versus a property that was damaged by wind causing damage to the roof or wind causing damage to the property that allowed rainwater to enter the property[.]"

Geer said, "The examiner's job is to review the information that they receive from the field adjuster." Geer clarified that the examiner may also rely on other things, such as, the engineering report. Geer agreed with Commerce that when she made the determination to deny coverage and draft the July 20, 2018 letter, she was relying on information that had been given to her, and she did not actually inspect the property. Geer stated that she relied on the engineering report that had been submitted to TWIA by ProNet, "[t]he adjuster's report and photographs, along with [Cheyenne Home's initial building consultant] report and photographs."

Geer testified that in this case, TWIA considered ProNet's opinion that there had

15

been no wind damage to the property as "more credible" than the original field adjuster's initial opinion that some wind damage occurred.[4] Geer found ProNet's opinion more credible based on the "[e]ngineer's experience, schooling, [and] understanding of roofing structures with a built-up roof," even though Geer said that she did not know "anything" about the original field adjuster's expertise. Geer averred she knew the engineer's qualifications because of "[h]is background in building construction." Geer testified that she concluded that there had not been any wind damage to Commerce's buildings after reviewing the initial field adjuster's photographs and report, which stated that there was wind damage. Geer, however, did not rely on the initial field adjuster's report.

Geer acknowledged that Cheyenne Homes had not been tasked with "identifying the cause of the damage to the property" and that the goal was to determine the "[d]amages found and cost estimation" while ProNet's role was to determine what caused the damage. Geer's notes showed that ProNet's engineer determined that the damage to the buildings was "from lack of maintenance, age deterioration on the roof." According to Geer, the engineer found photographs taken of the roofs prior to Hurricane Harvey and "found the exact same damages to the roof that was on the roof directly after Harvey, when the very first adjuster went out to inspect the property." Commerce asked Geer the purpose of requesting that ProNet review pictures of the buildings' roofs prior to Hurricane Harvey "a little over a month" after she sent the May 7, 2018 letter denying the claim. Geer did not know the reason but said, "In my experience, it would be someone at TWIA had looked at my denial letter and wanted further explanation of the two photos."

---

[4] The initial field adjuster worked for the firm Mason Claim Services ("Mason").

Geer stated that she had authority to request additional investigation and testing from ProNet such as uplift testing and core sampling; however, she did not do so. Geer did not recall anyone at TWIA "going back and looking at Mason's findings." Geer did not request logs of the roofs' maintenance from Commerce.

Thomas Irmiter, Commerce's expert witness, testified his business inspects and evaluates damage to buildings that are caused by, among other things, fire, hurricanes, construction defects, and floods. Irmiter opined that Hurricane Harvey caused the damages he observed on both roofs. Irmiter testified that the roofs cannot be repaired in the current condition due to the damage sustained during Hurricane Harvey; therefore, it would be necessary to replace the entire roofs. Irmiter testified that he used Xactimate, which is a software used to determine the costs of replacing roofs. According to Irmiter, the cost to replace the roofs on both buildings would "rough[ly]" be $5,543,106.44 with a depreciation of $122,330.14. Thus, Irmiter concluded that the actual cash value of replacing the roofs is $5,420,777.30. Commerce asked, "[W]hat is your opinion as to what has necessitated these repairs or this replacement in this case?" Irmiter replied, "Damage caused by Hurricane Harvey." On redirect examination, Irmiter said, "I believe that 80 percent of this roof assembly is currently wet as a result of Hurricane Harvey." TWIA's expert witness disagreed with Irmiter that wind had caused penetrations on the roofs that led to the water damage.

C.    **Cause of Loss**

By its first issue, TWIA challenges the evidence supporting the jury's finding that

17

the cause of Commerce's loss was the direct result of the wind during Hurricane Harvey.[5]

Commerce responds that there is sufficient evidence that Hurricane Harvey caused the damages to Commerce's roofs, including among other things, witness testimony "that Commerce's roofs were in good condition before they sustained wind damage in Hurricane Harvey," "TWIA's own 2012 underwriting report stat[ing] these were '10–15 year old roof[s]' in 'good condition,'" and testimony of multiple witnesses "that Harvey's winds caused damage, including Commerce's expert, Irmiter."

As set out above more thoroughly, evidence was presented that Hurricane Harvey's winds caused the roofs of both buildings to sustain damage resulting in water penetrating the roofs and causing damage to the roofs, ceilings, and interiors of both buildings. Further, there was testimony that had the roofs been in their current condition during Hurricane Harvey, as alleged by TWIA, those roofs would have blown off the buildings. In addition, the jury heard evidence that prior to offering a windstorm policy, TWIA must inspect the roofs of the buildings, that TWIA inspected Commerce's buildings' roofs, and that TWIA reported that the roofs were ten to fifteen years old and in good condition when it first insured Commerce's roofs in 2012. Additionally, Urbanec testified TWIA had not requested any repairs to the roofs, and TWIA had continued to offer Commerce a policy on a yearly basis for the roofs without notice to Commerce of any

---

[5] Question 1 of the jury charge asked and instructed the following: "Was TWIA's denial of [Commerce's] insurance claim improper under the policy"; "TWIA's denial of coverage was improper if [Commerce's] buildings sustained covered damage that was caused by the windstorm that occurred on or about August 25, 2017 (Hurricane Harvey)"; and "'Covered damage' consists only of direct physical loss to insured property caused by wind or rain, but only if rain first enters through wind-created openings in the insured property." Thus, TWIA challenges the jury's implicit finding that the damage to the roofs was sustained by covered damage of wind or wind-created openings.

18

deficiencies requiring repairs. Finally, the jury heard evidence that TWIA's adjuster had initially determined that the roofs had sustained wind damage and had accepted Commerce's claim in part.

Furthermore, Irmiter testified that the damage to the roofs of both buildings was caused by Hurricane Harvey's wind. Although TWIA presented evidence that the damage to the roofs preexisted Hurricane Harvey and theorize on appeal that there may have been other causes, the jury was free to disbelieve any evidence contrary to Irmiter's testimony that damage to the buildings was caused by the wind during Hurricane Harvey. *See City of Keller*, 168 S.W.3d at 820–22. Viewing the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not, we conclude that the evidence would have enabled the jury to find that the damage to Commerce's buildings' roofs was sustained by covered damage of wind or wind-created openings. *See City of Keller*, 168 S.W.3d at 821–22, 827. In addition, examining the whole record and considering both the evidence in favor of, and contrary to, the challenged finding, we cannot conclude that the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[6] *See Mar. Overseas Corp.*, 971 S.W.2d at 406–07;

---

[6] In its brief, TWIA has not detailed the evidence relevant to the issue and has not stated in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

However, although seemingly unrelated to its factual sufficiency challenge, in a sub-issue to issue one, TWIA contends that Commerce was required to segregate its damages by those caused by wind from Hurricane Harvey and those that had other causes, such as "clogged or frozen air conditioning units, leaking drain pans, clogged drain lines, corrosion, and man-made penetration through the roof, to name a few." TWIA then cites evidence it claims support a finding that Commerce's roofs' damage preexisted Hurricane Harvey, including that "Commerce asked tenants for years not to make roof penetrations because they can and had caused leaking"; "ProNet engineers assert water entered the buildings through these unsealed openings"; "Irmiter testified there were fifty-six penetrations on Building 1 and fifty-two penetrations on

*Cain*, 709 S.W.2d at 176.

## D.     Segregating Damage

As a first sub-issue to its first issue, TWIA contends that Commerce failed to provide evidence segregating damage to the roofs of its building caused "by the excluded perils of rain and other items such as wear and tear." Specifically, TWIA points to evidence that Commerce's roofs leaked and required repair prior to Hurricane Harvey.[7]

The doctrine of concurrent causation "provides that when . . . covered and non-covered perils *combine* to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril(s)." *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 302–03 (Tex. App.—San Antonio 1999, pet. denied) (emphasis added). In Texas, it is well-settled that "if an insurer pleads an 'exclusion under the policy' the 'insureds [are] obligated to introduce evidence to prove and secure jury findings that damage was caused solely by the [covered risk]; or segre[gate] the damage caused by the insured peril from that caused by . . . an excluded peril.'" *Travelers Pers. Sec. Ins. Co. v. McClelland*, 189 S.W.3d 846, 849 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 162 (Tex.1971)).

Here, TWIA did not plead any specific exclusion of loss as set out in its policy.[8]

---

Building 2"; and "Almost every roof repair Commerce made pre and post-Harvey occurred at man-made penetrations." However, these were facts that the jury was free to believe or disbelieve. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

[7] We note that although TWIA generally cites authority concerning segregating damages when there are concurrent causes, it does not apply the law to the facts with a clear and concise argument. *See* TEX. R. APP. P. 38.1(i). Nonetheless, as we are able to construe the issue and address it, we will do so.

[8] On appeal, TWIA claims that "many things can cause leaking—clogged or frozen air conditioning units, leaking drain pans, clogged drain lines, corrosion, and man-made penetrations through the roof, to name a few." It further asserts that "Commerce's roofs had many of these problems." Nonetheless, as set out above, there is legally sufficient evidence to support the jury's finding that wind alone caused the

20

Thus, there was no evidence before the jury that could have supported a finding that there had been a *contributing* factor to the damage. *See McKillip*, 469 S.W.2d at 162. Moreover, Commerce refuted TWIA's evidence that the damage preexisted Hurricane Harvey, introduced evidence that proved that the damage to the roofs was caused *solely* by the wind, and secured such a jury finding. *See McClelland*, 189 S.W.3d at 849. TWIA, on the other hand, denied that any of the damage to the roofs was caused by wind during Hurricane Harvey, claimed that all the damage to the roofs preexisted the hurricane, and did not request a jury question asking the jury to determine whether the damage was due to wind in *combination* with an excluded cause. *See id.* Thus, the evidence did not raise the issue of concurrent causation, and TWIA did not provide evidence regarding any "excluded perils" as had been done in *Wallis*.[9] *See Wallis*, 2 S.W.3d 300, 302–03. Finally, Commerce did not request a jury question regarding segregation. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) (providing that we "must" analyze the sufficiency of the evidence "in light of the jury charge . . . [given] without objection").

Based on these facts, we conclude that the doctrine of concurrent causation is not applicable, the evidence is sufficient to support a finding that wind solely from Hurricane Harvey caused Commerce's damage, and Commerce did not have a burden to segregate its damage. *See Wallis*, 2 S.W.3d at 302–03; *see also Southland Lloyds Ins. Co. v. Cantu*,

---

damage to the roofs.

[9] TWIA on appeal cites evidence it claims shows that the damage to the roofs occurred before Hurricane Harvey, including the following: (1) "frequent, significant water ponding on Commerce's flat roofs, which cause leaks,": (2) "leaking at the flashing joints around the air conditions"; and (3) "corrosion, which allowed leaks." We are required to view the evidence in the light most favorable to the jury's verdict; therefore, we must conclude that the jury believed Commerce's evidence that these problems had been remedied prior to Hurricane Harvey. *See City of Keller*, 168 S.W.3d at 819.

399 S.W.3d 558, 576 (Tex. App—San Antonio 2011, pet. denied) (deferring to the jury's finding that the hailstorm alone and not wear and tear caused the damage to the plaintiffs' property because "unlike in *Wallis*, the jury . . . was not required to guess what percentage of the damage was caused by the hailstorm; instead, the jury was faced with a credibility question: the [plaintiffs] claimed all the damage itemized in [the expert's] report was due to hail, while Southland claimed some of the damage was caused by ordinary wear and tear"); *U.S. Fire Ins. Co. v. Matchoolian*, 583 S.W.2d 692, 694 (Tex. App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.) (reversing the trial court's judgment because "[u]nder the undisputed evidence rain and wind were presented as concurrent causes; and . . . no attempt was made to determine the amount of loss caused Solely by the wind"); *McKillip*, 469 S.W.2d at 162 ("Travelers having plead [sic] the exclusion under the policy of loss by snowstorm, the insureds were obligated to introduce evidence to prove and secure jury findings that the damage was caused solely by the windstorm, an insured peril; or segregating the damage caused by the insured peril from that caused by the snowstorm, an excluded peril."). In addition, examining the whole record and considering both the evidence in favor of, and contrary to, the challenged finding, we conclude that the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Mar. Overseas Corp.*, 971 S.W.2d at 406–07; *Cain*, 709 S.W.2d at 176. We overrule TWIA's first sub-issue to its first issue.

## E.    Expert Opinion

By what we construe as second and third sub-issues to its first issue, TWIA contends that Irmiter's testimony is irrelevant and unreliable; therefore, the evidence is

legally insufficient to show that the damage to the roofs was caused by wind. According to TWIA, Irmiter's "baseless opinion will not support a judgment even if there is no objection to their admission."

Citing *Whirlpool Corp. v. Camacho*, TWIA argues that under our legal sufficiency review, we are required to evaluate Irmiter's testimony for reliability and relevance. *See* 298 S.W.3d 631, 640 (Tex. 2009) (agreeing with appellees "that proper appellate legal sufficiency review pursuant to [a] challenge [to an expert's opinion] requires evaluating [the expert's] testimony by considering both *Robinson*-type factors and examining for analytical gaps in his testimony"). We agree with TWIA that *Camacho* applies when a party challenges the legal sufficiency of the evidence on the basis that the expert testimony is unreliable and not relevant. *See id.* Nonetheless, TWIA as the appellant still bears the burden to provide this Court with substantive legal analysis of the issue, and under this purported claim, to provide us with a brief explanation as to which *Robinson*-type factors support a conclusion that Irmiter's testimony is unreliable and not relevant and to explain which analytical gaps in his testimony lead to a conclusion that his testimony is unreliable and not relevant. *See* Tex. R. App. P. 38.1(i). TWIA generally cites *Camacho*; however, it does not provide a detailed explanation of which *Robinson*-type factors we must find are lacking and how the supposed analytical gaps make Irmiter's testimony unreliable. *See id.* Nonetheless, we will address this issue as we understand it.

### 1. Applicable Law

The proponent of expert testimony must prove the testimony is relevant and

reliable. *Camacho*, 298 S.W.3d at 639. "The proponent must satisfy its burden regardless of the quality or quantity of the opposing party's evidence on the issue and regardless of whether the opposing party attempts to conclusively prove the expert testimony is wrong." *Id.* at 639. A reviewing court may not "merely accept 'experience' as a substitute for proof that an expert's opinions are reliable and then only examine the testimony for analytical gaps in the expert's logic and opinions." *Id.* Unobjected-to expert testimony that is supported by any basis, even if the basis is unreliable, is considered probative evidence. *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014) (citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009)). However, when the expert has no basis for his opinion "or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Id.* Expert opinion is unreliable when there is too great an analytical gap between the data on which the expert relies and the opinions offered. *Kinder Morgan Prod. Co., LLC v. Scurry Cnty. Appraisal Dist.*, 637 S.W.3d 893, 906 (Tex. App.—Eastland 2021, pet. Denied). "Analytical gaps may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached." *Id.*

## 2. Relevant Opinion

By its second sub-issue to its first issue, TWIA first states that Irmiter's testimony was not relevant because the "jury was not asked to determine if Commerce's roofs were

wet" and "none of Irmiter's testimony about instrumentation he used to locate and confirm the presence of water aided the jury in resolving a factual dispute." This is the extent of TWIA's argument. Accordingly, it is not adequately briefed.[10] *See* Tex. R. App. P. 38.1(i).

Nonetheless, Irmiter testified that he used instruments to locate and confirm that water seeped into the roof through penetrations caused by *wind* during Hurricane Harvey. According to Irmiter, the water seeped into the buildings due to *wind damage*, and he inspected the water damage to determine whether the roofs needed replacement after being opened by the wind which caused rain to enter the buildings. On the other hand, TWIA's expert, Armando Selva, spent time opining on the roofs' water damage that he attributed to other causes beside wind. Selva agreed that water seeping into the building due to wind making an opening in the roofs is damage to the building. Moreover, Irmiter testified that replacement of the roofs was necessary because the wind caused so much damage to the roofs, rainwater seeped into the roofs causing an eighty percent saturation of the roofs. Thus, whether water damage occurred due to the wind causing penetration in the roofs versus other causes was disputed at trial based on the experts' conflicting testimony and therefore relevant. *See* Tex. R. Evid. 401.

### 3. Reliability of Irmiter's Testimony

Next, TWIA claims that Irmiter "simply concluded" that the roofs openings were

---

[10] As we understand it, TWIA complains that the basis for Irmiter's opinion is not supported by the evidence; thus, the evidence is insufficient to show that the roofs were damaged by the wind during Hurricane Harvey. However, TWIA's challenge to Irmiter's testimony about the extent of water damage pertains to the admission of the evidence because TWIA's complaint is that such testimony was irrelevant to whether the roofs had been damaged by the wind. TWIA does not explain how this complaint constitutes an attack on the sufficiency of the evidence, and we are unable to make such a leap without further briefing. *See* Tex. R. App. P. 38.1(i).

25

caused by the wind." TWIA does not point to any unreliable foundational data that Irmiter allegedly relied upon, or any of Irmiter's specific opinion that was drawn from any such unreliable data. *See Helena Chem. Co.*, 47 S.W.3d at 499. In addition, TWIA does not state that Irmiter's opinion is based on certain assumptions about the facts, and it does not provide us with evidence showing that any alleged assumptions about the facts were unfounded. *See City of Keller*, 168 S.W.3d at 813. Instead, TWIA generally challenges Irmiter's basis for his opinion that the wind caused the damage to the roofs. TWIA states: "Eschewing substantive facts or supporting tests, Irmiter repeatedly testified his opinions were based on forty-five years of experience, but Irmiter failed to connect his wet-roof finding with his ultimate opinion that Harvey's winds produced a wind-created opening (as required by the policy)." According to TWIA, Irmiter's "baseless opinions will not support a judgment even if there is no objection to their admission."

Irmiter testified that he visually inspected the roofs and performed other tests approved and required by the ASTM guidelines. Likewise, TWIA's own expert testified that he utilized the same procedures that Irmiter followed when he made his visual inspection. Neither TWIA nor Selva performed any other tests not performed by Irmiter to determine whether the wind caused the damage to the roofs or the water intrusion. Irmiter testified that during his scoping visit, he inspected the buildings inside and outside "looking for signs something happened at this location." According to Irmiter, he followed ASTM guidelines that are "recognized by the engineering [community] at large [and] by the International Code Council as a definitive source that you can reference for guidelines." TWIA points to nothing in the record indicating that the ASTM guidelines or

26

the International Code Council are unreliable sources of guidelines for inspection of roofs. Selva did not follow the ASTM guidelines or International Code Council and he merely performed visual inspection of the roofs.

Based on his visual observation of the repairs made to the roofs post-Harvey, Irmiter believed the repairs "appear to be reactionary where they're trying to plug something quickly." Irmiter, thus, concluded after his visual inspection and other tests that the damage was due to high winds during Hurricane Harvey. In addition, Irmiter testified that the winds even at eighty-two miles per hour as claimed by a meteorologist's report obtained by TWIA could cause wind damage to the roofs; Selva stated he did not disagree with this proposition. Urbanec acknowledged that TWIA does not dispute Irmiter's interpretation of the wind speeds, which Irmiter gathered from the Benchmark Weather wind speed reports obtained by TWIA and the meteorologist's report.[11] Irmiter observed damage patterns in the roofs which were consistent with eighty-two-mile per hour winds and ninety-eight per hour winds. His visual inspection included looking for wind scour (dislodged gravel), which were present, and stated that the wind scours were caused by strong wind, which necessarily had to have exceeded eighty-mile per hour winds. Selva agreed that seeing wind scour on the roofs would lead to a conclusion that wind had caused openings in the roof.

According to Irmiter, wind causes a "suction effect" primarily on a roof's edges, and what he observed showed evidence that the wind caused such damage to the roofs.

---

[11] The meteorologist estimated that the wind speeds during Hurricane Harvey were "between 82 and 85 miles per hour, with sustained winds of . . . 65 miles per hour." The Benchmark Weather report estimated the winds as being sustained winds of sixty-seven miles per hour with maximum three-second wind gusts of ninety-eight miles per hour at the property.

Irmiter and Selva both looked for these features when each one visually inspected the buildings. Selva's description of the method he uses to inspect for wind damage on a roof and his use of a visual inspection are consistent with Irmiter's technique to establish a basis for finding that wind had caused the damage to the roofs.[12] Selva disagreed with Irmiter's conclusion that there was evidence that the panels had been uplifted by the wind, but he utilized the exact same method as Irmiter of visually inspecting the roofs and looking for the same problems that Irmiter had done during his visual inspection. On cross-examination by Commerce, Selva agreed that he merely conducted a visual inspection of the roofs.

The jury heard additional evidence that wind caused the damage to the roofs, including that TWIA's own claims examiner had determined in its first inspection that wind had caused damage to the buildings. TWIA's adjuster also determined that the buildings had suffered some water intrusion which had been caused by wind-created openings during Hurricane Harvey. Moreover, Ramon said that when he arrived two days after Hurricane Harvey, he observed that the air conditioning covers were in the parking lot, and when he was on the roofs he noticed that "some of the AC's didn't have their AC panels on"; "drain lines [were] scattered everywhere"; "some turbines were loose," "rattling" and "out of balance"; and he felt that he would fall through a portion of the roof because "there was section that had a real soft spot," which had not been present prior to Hurricane Harvey. Inside the buildings, Ramon "saw a lot of damage" such as insulation

---

[12] Additionally, Mary Koenig, a claims adjuster for TWIA who initially investigated Commerce's insurance claim and who found there had been some wind damage to the buildings, testified that a field adjuster will visually inspect the property, talk to the owner of the property, and take photographs to determine whether there has been damage due to the wind. Tasks that Irmiter testified that he performed.

hanging, "[t]he walls had water stains coming down," and "[t]he carpet was wet." Ramon stated that after one particularly dreadful rainstorm post-Harvey, he saw the roofs leaking that he had "[n]ever" seen before.

Commerce's site manager, Sharon Endes, testified that she went back to the property approximately "within the week, or a week" after Hurricane Harvey. According to Endes, "[i]t looked like a bomb went off," and there was "a lot of water everywhere, trees, tree limbs, broken fences, a lot of puddles of water," and the electricity was off. Endes said that "ceilings tiles were down," the carpets were "squishy," and in one of the units Endes inspected, "water came from the top at the ceiling." Endes testified that although pre-Harvey, there had been leaks to the roof, none of the previous damage to the property "came close to what [she] saw after Hurricane Harvey." Endes believed that the water came from the ceiling, and she agreed with Commerce that the property did not "have a giant inundation of water into all of the units from rising flood water." Ramirez testified that before Hurricane Harvey the roofs were in "good condition" overall. Ramirez believed that Hurricane Harvey caused significant damage to the roofs due to the wind and debris.

Thus, the jury could have reasonably believed Irmiter's testimony that the wind caused damage to the roofs which in turn caused the rain to penetrate the buildings' roofs and interiors during Hurricane Harvey. *See City of Keller*, 168 S.W.3d at 819. Viewing the evidence in the light most favorable to the verdict crediting favorable evidence that a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not, we conclude that the evidence supports the reliability of Irmiter's basis for his opinion. *City of Keller*, 168 S.W.3d at 821–22, 827. In addition, examining

29

the whole record and considering both the evidence in favor of, and contrary to, the challenged finding, we cannot conclude that the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Mar. Overseas Corp.*, 971 S.W.2d at 406–07; *Cain*, 709 S.W.2d at 176. We overrule TWIA's second sub-issue to its first issue.

### 4. Other Causes

By a sub-issue, TWIA claims that Imiter "failed to rule out other causes of water intrusion such as corrosion, man-made penetrations (leaking both pre- and post- Harvey), age, deterioration, and maintenance deficiencies." TWIA does not explain with proper legal argument why it was Irmiter's burden to rule out other causes of the damages. *See* TEX. R. APP. P. 38.1(i). We are not allowed to make the appellant's argument for it. *See Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). Doing so would cause us to run afoul of the ideal that "we are to be neutral and unbiased adjudicators of the dispute before us." *Plummer v. Reeves*, 93 S.W.3d 930, 931 (Tex. App.—Amarillo 2003, pet. denied). We are precluded from becoming an advocate for appellant. *See id.* Without further explanation from appellant, we are unable to reverse this judgment on the basis that Irmiter allegedly failed to "rule out other causes of water intrusion such as corrosion, man-made penetrations (leaking both pre- and post- Harvey), age, deterioration, and maintenance deficiencies." *See* TEX. R. APP. P. 38.1(i).

### 4. Analytical Gap

Regarding an analytical gap between the data Irmiter relied upon and his opinion, TWIA merely sets out that "[a]nalytical gaps include circumstances where an expert

unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts varying materially from facts, or the expert's opinion is based on tests or data that do not support the conclusions reached." Then TWIA states, "All three are true of Irmiter's conclusion that Commerce's wet roofs were caused by Harvey's winds" and that "[h]is opinions should have been excluded and are not evidence to support the verdict. This sub-issue is inadequately briefed, and we are unable to address it. *See* TEX. R. APP. P. 38.1(i). We overrule TWIA's third sub-issue to its first issue.

## F. Total Loss

By a fourth sub-issue to its first issue, as we understand it, TWIA contends that the jury awarded replacement costs as opposed to awarding costs that Commerce paid to repair the roofs, which TWIA claims totaled less than Commerce's deductible under the contract. TWIA cites evidence showing that Commerce made several repairs post-Harvey that according to TWIA were minimal.

### 1. Applicable Law

We review the sufficiency of the evidence in light of the jury instruction actually given when neither party objects to it. *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 220–21 (Tex. 2005)). This is so regardless of whether the charge incorrectly provides a statement of the law, "effectively increases the burden of proof on a party beyond that actually required by the correct law," or causes us to apply a higher standard of review. *Id.*

When a party objects to an erroneous definition or instruction in the jury charge,

31

we must measure the legal sufficiency of the evidence supporting the jury's finding against the charge that should have been given. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002). The trial court must submit to the jury the controlling questions, instructions, and definitions raised by the pleadings and supported by the evidence. TEX. R. CIV. P. 278; *Triplex Commc'ns v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995). A trial court has broad discretion to fashion the charge, so long as it is legally correct. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999).

### 2. Discussion

It appears that TWIA challenges whether Commerce was *entitled* to the replacement costs. Question 2 asked, "What sum of money, if paid now in cash, would fairly and reasonably compensate [Commerce] for the covered damage sustained to each insured building, if any, that were caused by the windstorm that occurred on or about August 25, 2017 (Hurricane Harvey)?" Thus, Question 2 permitted the jury to find *the amount* it would cost to *replace* each of the roofs, and it did not ask whether Commerce was *entitled* to the replacement cost or what were the costs of *repairs*. Instead, the question assumes that Commerce *is entitled* to the replacement costs.

Interrelatedly, in a sub-issue to its third issue concerning charge error, TWIA states:

> TWIA also objected there is no evidence the roofs are a total loss, but the jury was not given the option to assess repair costs, which was in essence an instructed verdict and/or a fact finding by the court that the roofs were a total loss. The evidence demonstrates the contrary, as explained above. Moreover, as with Question 1, Question 2 diluted Commerce's burden of proof, conflicted with the definition of "covered damage" in the charge, misstated the policy obligations, and diluted the causation requirements.

32

We construe this argument as challenging the trial court's submission of Question 2 to the jury. However, TWIA provides no pertinent authority supporting its claim that Question 2 was erroneous, and it does not provide any substantive argument supporting a conclusion that Question 2 is legally incorrect. *See* TEX. R. APP. P. 38.1(i); *see also Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]f the trial court has 'to resolve a legal issue before the jury could properly perform its fact-finding role[,] . . . a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial."). TWIA has not properly met its appellate burden to show that Question 2 as submitted to the jury was not raised by the pleadings or supported by the evidence. *See* TEX. R. CIV. P. 278; *Triplex Commc'ns*, 900 S.W.2d at 718. TWIA is required to discuss the facts and the authorities it relied upon. *Sweed v. City of El Paso*, 195 S.W.3d 784, 786 (Tex. App.—El Paso 2006, no pet.). Uttering brief conclusory statements that are not supported by legal citations does not satisfy this requirement *Id.* "Failure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint." *Martinez v. El Paso Cnty.*, 218 S.W.3d 841, 844 (Tex. App.—El Paso 2007, pet. struck) (citing *Leyva v. Leyva*, 960 S.W.2d 732, 734 (Tex. App.—El Paso 1997, no writ)).

Thus, we are unable to determine whether Question 2 is erroneous and assuming Question 2 is erroneous, what the legally correct question's form should have been. *See Osterberg*, 12 S.W.3d at 55. Moreover, without substantive legal analysis from TWIA, we are unable to conclude that the proper question would have asked the jury to determine repair costs as opposed to replacement costs. *See Martinez*, 218 S.W.3d at 844. TWIA

33

has waived any complaint that Question 2 is erroneous. We may only measure the sufficiency of the evidence as it relates to the question submitted, which in this case asked the jury to determine the amount it would cost to *replace* the roofs. *See id.*; *see also Osterberg*, 12 S.W.3d at 55 ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."); *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985) (explaining that because the appellant did not object to a jury instruction "and no point of error was raised concerning it[,] . . . the court of appeals was also bound to review the evidence in light of this instruction"). The jury determined the replacement costs was $905,910 for building one and $603,840 for building two. TWIA does not challenge these findings. Therefore, we overrule TWIA's fourth sub-issue to its first issue.

## G. Intent to Harm Commerce

By what we construe as a fifth sub-issue to its first issue, in a footnote, TWIA states that the evidence is insufficient to support the jury's finding that TWIA intended to harm Commerce. In this footnote, TWIA claims that this sufficiency issue is "discussed below in connection with TWIA's jury charge complaints [and] is incorporated by reference."[13] After reviewing TWIA's third issue regarding jury charge error, we located what we believe to be TWIA's sufficiency argument, which states:

> TWIA also objected to Question 3 because there is no evidence TWIA had specific intent to harm Commerce. Specific intent to do a certain act is not enough. For instance, Commerce elicited irrelevant testimony from Urbanec

---

[13] TWIA placed its complaint that the evidence is insufficient to show that TWIA intended to cause harm in its section concerning charge error. However, TWIA does not include any argument in this sub-issue complaining about jury charge error or explain how its insufficient evidence argument relates to its charge error argument. Moreover, we conclude that this issue is also inadequately briefed as to any complaint regarding charge error. *See* TEX. R. APP. P. 38.1(i).

> that TWIA "intended" to deny Commerce's claim. For the imposition of additional damages, the express language of the statute requires specific intent to harm Commerce via mishandling of Commerce's claim.
>
> Urbanec confirmed TWIA had no intent to harm Commerce by revisiting its claims decision. She also testified her definition of intent was different than what was suggested by Commerce's lawyer when he inquired whether TWIA "intended" to do a series of specific acts.

(Internal citation omitted).

Thus, TWIA's complaint focuses on the definition of "intent" offered in Question 3 and therefore is a challenge to the trial court's submission of the definition of intent.

In Question 3, the charge defined "intent" as "actual awareness of the facts surrounding the act or practice listed below, coupled with the specific intent that [Commerce] suffer harm or damages as a result of the act or practice." Question 3 asked: "Do you find by clear and convincing evidence that TWIA mishandled Plaintiff's claim to Plaintiff's detriment by intentionally performing one of the actions listed below": (1) "Failing to notify [Commerce] of TWIA's final coverage decision no later than 60 days after receipt of [Commerce's] claim, without good cause or"; "(2) "Rejecting the claim without conducting a reasonable investigation with respect to the claim; or" (3) "Denying coverage for a claim in part or in full if TWIA's liability has become reasonably clear as a result of its investigation with respect to the denied claim" The jury answered, "Yes."

In its sufficiency of the evidence section of its brief, TWIA does not provide any citation to authority supporting its argument or any substantive analysis of the issue presented explaining why the definition of intent is erroneous. *See* TEX. R. APP. P. 38.1(i). Instead, in a footnote, TWIA directs us to another portion of its brief, which also fails to meet the requirements of the Texas Rules of Appellate Procedure as it does not explain

35

why the trial court erred in submitting this definition of intent to the jury. *See id.* Thus, we conclude that this issue is inadequately briefed.[14] *See id.*

## II.   ADMISSION AND EXCLUSION OF EVIDENCE

By its second issue, TWIA contends that the trial court improperly excluded its proffered exhibits of Google Earth images of Commerce's buildings. According to TWIA, these images "showed stain patterns on the roofs, which are a product of aging and longstanding water accumulation, similar in size and location in 1995 and 2017, meaning the roofs were considerably older than [the] alleged 1994 construction and Harvey's damages were minimal." TWIA made this argument to the trial court and stated:

> If permitted, Ms. Urbanec would testify to that fact, which is a material fact in this case not only because it explains the condition of the roof, not only because it is inconsistent with the testimony of Mr. Kavoian, but most importantly, it goes to the depreciation aspect of our—of the damage model in this case if the jury finds the roof is a total loss and needs to be replaced.

By several sub-issues to its second issue, TWIA contends that the trial court improperly admitted hearsay as follows: (1) Kavoian's testimony that the roofs were built in 1994 and testimony as to the anticipated life expectancy of the roofs; (2) Irmiter's expert report; and (3) "a summary of responses to a post-litigation tenant survey."

---

[14] By a sixth sub-issue to its third issue, TWIA states:

> For the same reasons discussed in connection with Question 3, there was no evidence to support submission of Question 4, which asked, "What sum of money in addition to damages found in Question No. 3, if any, should be awarded to Plaintiff because TWIA's conduct was committed intentionally?" Those arguments and TWIA's earlier no evidence arguments are incorporated by reference.

> (Internal citations omitted).

> Again, other than this bare assertion, TWIA does not cite applicable law or provide substantive analysis of this assertion. Accordingly, we conclude this assertion is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

**A.      Standard of Review and Applicable Law**

The trial court has sound discretion to exclude or admit evidence. *Jones v. Mattress Firm Holding Corp.*, 558 S.W.3d 732, 737 (Tex. App.—Houston [14th Dist.] 2018, no pet.). "A trial court exceeds its discretion when it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles." *Id.* We may not substitute our own judgment for that of the trial court when we review matters committed to the trial court's discretion. *Id.* "Thus, the question is not whether this court would have admitted the evidence. Rather, an appellate court will uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling." *Id.*

Generally, relevant evidence is admissible. *Id.* Evidence is relevant if it has "any tendency to make a fact of consequence in determining the action more or less probable." *Id.* (citing TEX. R. EVID. 401). However, relevant evidence can be excluded: (1) if the probative value is substantially outweighed by unfair prejudice; (2) it would lead to confusion of the issues; (3) the evidence has the potential to mislead the jury or cause undue delay; or (4) it causes the needless presentation of cumulative evidence. *Id.* (citing TEX. R. EVID. 403).

**B.      The Google Photographs**

If photographs are relevant to any issue in a case, they are admissible. *Id.* A photograph relevant to an issue in a case is admissible when a witness authenticates it as an accurate portrayal. *Id.* A verifying witness must be familiar with the objects involved in the photograph to be allowed to authenticate the photograph. *Id.* (first citing TEX. R. EVID. 901(a), (b)(1); and then citing *Kroger Co. v. Milanes*, 474 S.W.3d 321, 342 (Tex.

App.—Houston [14th Dist.] 2015, no pet.)). "Conditions in a photograph do not need to be identical to the conditions at the time of the event in question 'if the changes are explained in such a manner that the photograph . . . will help the jury in understanding the nature of the condition at the time of the event at issue.'" *Id.* (citing *Kroger*, 474 S.W.3d at 342). "Photographs taken at or around the same time from the same angle are generally cumulative and excluding them is not an abuse of discretion." *Id.*

### 1. Scope of Review

As a preliminary matter, TWIA first argues that Commerce has not "preserved" its objections to TWIA's proffered Google Earth photographs because Commerce "failed to obtain a ruling on all but one" objection. TWIA sets out correctly that Commerce initially objected to the photographs because they were not properly authenticated, untimely produced, and were therefore prejudicial. TWIA reasons that because the trial court did not specifically rule on Commerce's objections, we are not allowed to review the trial court's exclusion of the photographs on those bases.

However, "[w]e 'must uphold the trial court's [decision to exclude evidence] if there is any legitimate basis for the ruling' or 'if it is correct under any legal theory,' 'even if that ground was not raised in the trial court.'" *Great N. Energy, Inc. v. Circle Ridge Prod., Inc.*, 528 S.W.3d 644, 659 (Tex. App.—Texarkana 2017, pet. denied) (citing *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 264 (Tex. 2012)); *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 73 (Tex. App.—Houston [14th Dist.] 2016, no pet). Therefore, we will examine all the bases for the trial court's decision that are suggested by the record or urged by the parties in the trial court. *Bennett*, 489

38

S.W.3d at 73.

### 2. Prejudice to Commerce for Late Production

As acknowledged by TWIA, Commerce objected to the admission of the photographs on the basis that the late production caused it prejudice. Therefore, we may uphold the trial court's exclusion of the photographs if the ruling is correct under this legal theory. *See Great N. Energy, Inc.*, 528 S.W.3d at 659.

When a party fails to make, amend, or supplement a discovery response in a timely manner, it may not introduce into evidence the untimely disclosed material unless the trial court finds that (1) there was good cause for the failure to timely disclose or (2) the failure will not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6(a). Evidence not timely disclosed is automatically excluded. *Fort Brown Villas III Condo. Ass'n v. Gillenwater*, 285 S.W.3d 879, 882 (Tex. 2009). "The purposes of this rule are to promote responsible assessment of settlement and prevent trial by ambush." *In re Kings Ridge Homeowners Ass'n*, 303 S.W.3d 773, 783 (Tex. App.—Fort Worth 2009, orig. proceeding). "The party offering the undisclosed evidence has the burden to establish good cause or lack of surprise, which must be supported by the record." *Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 860 (Tex. App.—Dallas 2006, no pet.); *see also* TEX. R. CIV. P. 193.6(b). Determining whether a party has met this burden is within the trial court's "broad discretion." *Syrian Am. Oil Corp., S.A. v. Pecten Orient Co.*, 524 S.W.3d 350, 366 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Here, TWIA does not argue that its production of the photographs was timely; thus, the photographs were properly excluded automatically. *See* TEX. R. CIV. P. 193.6. In

addition, TWIA does not argue on appeal that it provided evidence that good cause existed for the failure to timely disclose or that the failure did not unfairly surprise or unfairly prejudice Commerce. *See* TEX. R. CIV. P. 193.6(a). *Harpst v. Fleming*, 566 S.W.3d 898, 907 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("'When an appellee objects to evidence on several independent grounds and, on appeal, the appellant complains of the exclusion of the evidence on only one of those grounds, the appellant waives any error by failing to challenge all possible grounds for the trial court's ruling that sustained the objection.'" (citations omitted)). We overrule TWIA's second issue.[15]

### 3. Prejudice to TWIA

Finally, TWIA claims that it was prejudiced by exclusion of the photographs because the jury "likely would not have awarded Commerce millions of dollars." To show prejudice, the trial court must have committed error in the exclusion of the evidence. *See Jones*, 558 S.W.3d at 739. Here, we have already concluded that the trial court did not abuse its discretion by excluding the photographs. Therefore, we need not address this assertion.

### C. Irmiter's Report

By its first sub-issue to its second issue, TWIA contends that the trial court erroneously admitted Irmiter's report because it contains hearsay. TWIA does not cite the hearsay rule or its exceptions. *See* TEX. R. APP. P. 38.1(i). It also does not cite the record

---

[15] By a sub-issue, TWIA argues that the trial court should have allowed Urbanec to testify about the Google Earth photographs that the trial court excluded. We have concluded that the trial court did not abuse its discretion in excluding those photographs; therefore, we cannot conclude that the trial court abused its discretion when it disallowed Urbanec to testify about those inadmissible photographs. We overrule this sub-issue.

where it objected to Irmiter's report on the basis of hearsay. Thus, we are unable to determine the trial court's reasons for admitting the report. Finally, TWIA argues that "[t]he harm that should be presumed is clear from the opinions Irmiter's report presents as accepted fact." This is the extent of TWIA's argument regarding harm. Accordingly, we conclude this issue is inadequately briefed. *See id.* We overrule TWIA's first sub-issue to its second issue.

## D.    Age of Roofs

By a second sub-issue to its second issue, TWIA contends that the trial court admitted hearsay when Kavoian testified that "the seller told him the roofs would be replaced before his purchase in September 1994" and that "a building inspector told him after purchase, with regular maintenance, the roofs could last 50 years."

### 1.    Pertinent Facts

During Kavoian's testimony, Commerce asked, "Do you have any idea how old the roofs were on Commerce One when you bought it?" TWIA asked to approach and objected on the basis that "I think this is based on hearsay." Commerce replied, "It is absolutely not hearsay" because "he's going to have to give definitive evidence that not only was it a condition of the sale but [that he] saw it." The trial court said, "Sir, I'm going to let you proceed. And sir, you can make your objection again if you need to." TWIA responded, "Very good." The trial court said, "Overruled at this time."

Commerce asked, "How . . . old were the roofs on the property when you purchased Commerce One?" Kavoian replied, without objection, "They had just been put on the building." Kavoian stated, without objection, that the seller "opted to put a brand[-

41

]new roof on the building before we bought it." Kavoian clarified that both roofs had been replaced. TWIA said, "All of that would be hearsay, Judge, every bit of it." The trial court replied, "Overruled. Continue." At this point, TWIA requested a running objection "to the hearsay."

Kavoian stated that it was his "understanding" that the deal to purchase the property included replacement of the roofs. He said, "That was the premise upon which we bought the property." Kavoian explained that the "bulk of the work" on replacing the roofs "had been done by the time we came on the scene." He said, "They were just wrapping up a few minor things. . . . I remember early on there were still some roofers up there just wrapping up a few things, nothing major." Kavoian said, "And then Mody Boathright, you know, Mody was a licensed engineer. . . . You know, he told me that it was a class A roof, perfect roof." Kavoian recalled that "an out[-]of[-]town roofer" had been hired to replace the roof and the company did "a very good job." In addition, Kavoian stated, that after the new roof was installed, he had Boathright inspect it. Commerce asked, "Did you ever have any suspicions the roofs weren't replaced?" Kavoian replied, "Oh, no." Kavoian said that the new roofs were supposed to last fifty years. TWIA objected again. The trial court overruled the objection.

**2.    Discussion**

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Generally, hearsay is not admissible. *Id.* R. 802.

Kavoian testified that he witnessed the roofers on the roofs "just wrapping up a few things" and that he understood that the seller had agreed to replace the roofs. This

42

evidence is not hearsay because Kavoian witnessed the roofers replacing the roofs and he made the agreement with the seller to replace the roofs. Thus, when he gave this testimony, Kavoian did not repeat an out-of-court declarant's statement. *See id.* R. 801(d). However, we assume without deciding that the trial court erred in admitting the rest of Kavoian's complained-of testimony. We proceed to a harm analysis.

TWIA's 2012 underwriting report which the trial court admitted without objection, states that the roofs were ten to fifteen years old and in good condition. In addition, Irmiter testified, without objection, that the roofs were not the original roofs built in the 1970s, the roofs were twenty-two years old, and the roofs were installed in the 1990s—specifically, Irmiter testified that the roofs were new around 1994. Thus, evidence that the roofs were not the original 1970's roofs and were built either in 1994 or approximately in 1997 was admitted into evidence without objection. Therefore, to the extent the trial court may have improperly allowed hearsay concerning the age of the roofs, we conclude error, if any, was harmless because evidence of the roofs' age was admitted without objection elsewhere. *See State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 881 (Tex. 2008) (explaining that because the complained of testimony was cumulative of substantially similar evidence that was not challenged on appeal, any error in admitting the testimony was harmless); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989) ("The erroneous admission of testimony that is merely cumulative of properly admitted testimony is harmless error."). We overrule TWIA's second sub-issue to its second issue.

E.    **Tenant's Survey**

By a third-sub-issue to its second issue, TWIA argues as follows:

43

After litigation was filed in June 2018, Commerce's expert created a tenant survey to inquire about interior leaks. The judge excluded responses to the survey. Over TWIA's objection, he allowed Commerce to introduce a summary of the responses, ruling TWIA had "opened the door" by asking Kavoian questions about the minimal leak complaints in Commerce's contemporaneous business records. That ruling was incorrect and asking a question based on admitted evidence does not waive the hearsay rule.

(Internal citations to the record omitted).

This issue is inadequately briefed. We overrule TWIA's third sub-issue to its second issue.[16] *See* TEX. R. APP. P. 38.1(i).

### III.    CHARGE ERROR

By its third issue, TWIA contends that the "charge was incorrect in numerous ways" as follows: (1) Question 1 (a) "fails to accurately (i) state the law, (ii) instruct the jury to exclude wind-driven rain, and (iii) track relevant policy language," (b) "misstates TWIA's coverage obligations, conflicts with the definition of 'covered damage' elsewhere in the charge and dilutes the policy's causation requirement"; (2) Question 2's definitions of replacement cost value and actual cash value "did not track policy language that require TWIA to pay the lesser of actual cash value minus depreciation or the cost to repair or replace with like kind and quality"; (3) Question 3 (a) allowed the jury to answer "Yes" without determining whether TWIA's mishandling of Commerce's claim was due to (i) "Failing to notify Plaintiff of TWIA's final coverage decision no later than 60 days after receipt of Plaintiff's claim, without good cause," (ii) "Rejecting the claim without conducting

---

[16] By what we construe as a fourth sub-issue to its second issue, TWIA contends that cumulative error caused the rendition of an improper judgment. However, we have not found error; therefore, the doctrine of cumulative error does not apply. *See Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 570 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998) ("Multiple errors, even if considered harmless taken separately, may result in reversal and remand for a new trial if the cumulative effect of such errors is harmful.").

44

a reasonable investigation with respect to the claim," or (iii) "Denying coverage for a claim in part or in full if TWIA's liability has become reasonably clear as a result of its investigation with respect to the denied claim," and (b) included an improper instruction implying that "TWIA intentionally mishandled Commerce's claim in a way not even germane to the statutory bases for additional damages"; and (4) "TWIA's questions and instructions should have been submitted.

## A.    Standard of Review

We review charge error under an abuse of discretion standard. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012*) (quoting Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855–56 (Tex. 2009)). "A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts." *Hawley*, 284 S.W.3d at 856 (citing TEX. R. APP. P. 61.1.). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Id.*

## B.    Question 1

First, TWIA states that it objected to Question 1 because it "fails to accurately (1) state the law, (2) instruct the jury to exclude wind-driven rain, and (3) track relevant policy language"; and it "misstates TWIA's coverage obligations, conflicts with the definition of 'covered damage' elsewhere in the charge and dilutes the policy's causation

45

requirement."[17] Specifically, TWIA claims that "Question 1 was premised upon Insurance Code § 2210.576" and "[b]ecause that statute does not define what constitutes a proper denial of coverage, this Court must look to the common law for guidance regarding Commerce's burden. TWIA states that "[t]o prove coverage under the common law, an insured must establish: (1) its damage is covered by the policy; (2) was incurred during the policy period; (3) by an insured person." TWIA then states that "[t]he only element in dispute is whether Commerce sustained covered damage." Thus, TWIA claims that "Question 1 was erroneously submitted because it did not inquire whether Commerce sustained covered damage."

This is the extent of this argument. There is no citation to pertinent authority and TWIA offers no substantive legal argument applying any law to the facts.[18] *See* TEX. R. APP. P. 38.1(i). These are mere utterances of bald assertions. Therefore, we conclude that this argument is not adequately briefed.[19] *See id.*

Next, TWIA states:

> TWIA incorporates by reference its no evidence arguments explained above. The jury was instructed, "'Covered damage' consists only of direct physical loss to insured property caused by wind or rain, but only if rain first enters through wind-created openings in the insured property." TWIA objected [that] the "covered damage" instruction erodes and dilutes the policy language concerning rain.

---

[17] TWIA does not explain why the trial court abused its discretion in overruling its listed objections. *See* TEX. R. APP. P. 38.1(i).

[18] Although TWIA cites *Seger v. Yorkshire Ins.*, 503 S.W.3d 388, 400 (Tex. 2016), it does not explain how the law in *Serger* applies to the facts here. *See id.*

[19] In this argument, TWIA informs the Court that it also objected to Question 1 because "there was no evidence to support submission of Question 1." This is not a properly presented issue. Therefore, to the extent that TWIA meant to argue that the evidence was insufficient to support the submission of Question 1, we conclude that it is inadequately briefed. *See id.*

46

(Internal citations to the record omitted). To the extent TWIA intends to brief this as an issue presented, it is inadequately briefed. *See id.*

**C.    Question 2**

TWIA next argues that "[e]ven though the jury was never asked if Commerce sustained covered damage, Question 2 asked, 'What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff for the covered damage sustain[ed] to each insured building, if any, that were caused by the windstorm that occurred on or about August 25, 2017 (Hurricane Harvey)?'" TWIA then recites the objections it made in the trial court and generally asserts that the trial court abused its discretion by submitting Question 2. Without proper legal analysis with citation to legal authority that is applied to the facts, we are unable to conclude that the trial court abused its discretion. This issue is therefore inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

**D.    Question 3**

First, TWIA challenges the trial court's submission of Question 3 because TWIA claims that it allowed the jury to find that mishandling Commerce's "claim could mean any one or more of the following": (1) "Failing to notify Plaintiff of TWIA's final coverage decision no later than 60 days after receipt of Plaintiffs claim, without good cause"; (2) "Rejecting the claim without conducting a reasonable investigation with respect to the claim"; or (3) "Denying coverage for a claim in part or in full if TWIA's liability has become reasonably clear as a result of its investigation with respect to the denied claim." TWIA specifically takes issue with the first possible way the jury was instructed it could have mishandled Commerce's claim. TWIA argues that this portion of "Question 3 misstates

47

the law regarding what TWIA must do within 60 days of receiving a claim."

According to TWIA, it was required to notify Commerce within sixty days that it either "(1) accepted coverage for the claim in full, (2) accepted coverage for the claim in part and denied coverage for the claim in part, or (3) denied coverage for the claim in full." TWIA claims that it "satisfied this requirement" and that it was not required "to provide a 'final' coverage decision within 60 days, and a decision made within 60 days is not, by statute or by the policy, a 'final decision,' in any event." TWIA argues that there is nothing preventing it from changing its disposition of a claim outside the sixty-day period so long as it sent out a disposition letter within the sixty-day period. To support its claim, TWIA cites Texas Insurance Code § 2210.5732, which authorizes supplemental payments under its policies. *See* TEX. INS. CODE ANN. § 2210.5732. Although § 2210.5732 allows supplemental payments to the claimant, it does not state that after accepting a claim within the sixty-day period, the insurance company has authority to then deny the claim after the sixty-day period has expired. *See id.* ("The association is authorized to provide for supplemental payments under a windstorm and hail insurance policy issued by the association."). Thus, we are unable to conclude that the trial court abused its discretion in the complained-of manner.[20]

Next, TWIA argues that "it is unclear why" Question 3 states:

Prior to TWIA's denial of coverage on this claim, because TWIA initially accepted coverage to wind damage to the roof systems of the buildings, that portion of [Commerce's] claim would have been subject to the appraisal process, which would have determined both the scope of damages and the

---

[20] TWIA complains that the trial court abused its discretion by submitting Question 3 as a single broad-form liability question that incorporated multiple theories of liability. This issue is not supported with citation to pertinent authority with substantive legal analysis. Therefore, it is inadequately briefed. *See id.*

48

amount of payment to repair those damages, if any.

TWIA argues that this instruction "does not assist the jury in determining if TWIA mishandled Commerce's claim by missing a required deadline, conducting an unreasonable investigation, or denying coverage after its liability had become reasonably clear" and that it implies that "TWIA intentionally mishandled Commerce's claim in a way not even germane to the statutory bases for additional damages." Thus, according to TWIA, this instruction was "an impermissible comment on the weight of the evidence."

At trial, Commerce argued that this instruction had been "invited" because testimony had "created jury confusion that had to be corrected." After reviewing TWIA's letter that accepted in part and denied in part Commerce's claim, the trial court submitted the instruction based on the letter's wording. TWIA does not provide substantive legal argument with citation to pertinent authority supporting a conclusion that the trial court abused its discretion in determining that the instruction had been invited by the testimony and based on the letter's wording. Therefore, we are unable to reverse the judgment as TWIA has not challenged all grounds for the trial court's ruling.[21] We overrule TWIA's third issue.[22]

---

[21] We note that in a footnote, TWIA argues that two cases cited by Commerce in the trial court to submit the complained-of instruction are distinguishable. However, TWIA merely asserts that the cases are distinguishable because in those two cases, the insurance company initially accepted full coverage, and here TWIA denied Commerce's claim in part. TWIA does not mention the trial court's reason for submitting the instruction and does not explain why this asserted distinction matters in our analysis. *See id.*

[22] TWIA also states:

Although it did not bear the burden of proof, TWIA's proposed questions and instructions were supported by the policy and Texas law. It was error to refuse them . . . because they would have assisted the jury on critical issues, and they accurately state the law. If this Court does not render judgment in TWIA's favor because there is no evidence to support the judgment, it should remand for a new trial because of the defective jury charge.

49

## IV. FOURTH ISSUE

By its fourth issue, TWIA contends that Commerce should have repaired its roofs, the "equitable 'doctrine of prevention'" does not apply, and "Kavoian admitted he has the financial means to replace Commerce's roofs."

## A. Condition Precedent

TWIA argues that "Commerce failed to satisfy the condition precedent to recovery under the Replacement Cost and Increased Cost of Construction endorsements." Specifically, TWIA argues that because "Commerce did not repair or replace its roofs, the event that triggers replacement cost value coverage has not occurred."

This issue appears to challenge the sufficiency of the evidence to support Question 2 asking the jury to determine the sum of money that "would fairly and reasonably compensate" Commerce "for the covered damage sustained to each insured building, if any, that [was] caused by" Hurricane Harvey's windstorm. However, as previously stated, we must review the sufficiency of the evidence in light of the jury instruction actually given when neither party objects to it. *Reliant Energy Services, Inc. v*, 336 S.W.3d at 782. Here, the jury charge does not include a question to the jury regarding whether Commerce satisfied the alleged condition precedent. In addition, TWIA does not cite wherein this voluminous record it objected to Question 2 on the basis that Commerce did not satisfy the alleged condition precedent, wherein it requested a question regarding a condition precedent in writing, or where the trial court overruled its objection to Question 2 on that

---

Without substantive legal analysis with citation to pertinent authority, we are unable to address this purported argument. *See id.*

50

basis or request for a question on condition precedent, and we have found no such objection or request in the record. *See Patriot Contracting, LLC v. Shelter Products, Inc.*, 650 S.W.3d 627, 651 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) ("If appellants assert that the trial court improperly omitted an instruction or question in the court's charge, they must do more than object to preserve their complaint for appeal; appellants must request and tender to the trial court a substantially correct instruction or question in writing."); *see also* TEX. R. CIV. P. 272 (requiring for a party to get a ruling on its objection to a jury question to preserve error). Therefore, our review of the sufficiency of the evidence is limited to the question as presented in the charge. *See id.* Accordingly, the charge does not require Commerce to prove that it made repairs or replaced the roofs to receive replacement costs and increased costs of construction. We overrule this issue to the extent that TWIA challenges the sufficiency of the evidence in that regard.

## B.    Doctrine of Prevention

Next, TWIA argues that Commerce "appear[ed] to be advancing the equitable 'doctrine of prevention,'" when it argued to the trial court that it was "excused from replacing or repairing its property because TWIA denied coverage." TWIA claims, without application of legal analysis to the facts of this case, that Commerce had the "burden under the prevention doctrine—to prove the denial of coverage made impossible necessary repairs or replacement." TWIA states that the doctrine of prevention is not recognized in Texas and even if it were recognized, "it would be inapplicable here because Kavoian clearly qualifies as a 'sophisticated party,' who has the money, or at least the financial ability to borrow the money, to replace Commerce's roofs."

TWIA cites *Devonshire Real Estate & Asset Mgmt., LP v. Am. Ins. Co.*, No. 3:12-CV-2199-B, 2014 WL 4796967, at *7 (N.D. Tex. Sept. 26, 2014), which states, "Under that doctrine [of prevention], 'when a promisor wrongfully prevents a condition from occurring that condition is excused.'" In *Devonshire*, the parties filed dueling motions for summary judgment asking the court to determine whether the contract allowed for replacement cost or actual cash value. *See Devonshire Real Estate & Asset Mgmt., LP*, 2014 WL 4796967, at *4. The court determined that the contract only allowed for the insured to receive replacement cost after it completed repairs. *Id.* The *Devonshire* court noted that the contract allowed the insured to receive damages on a replacement cost basis but only after "the lost or damaged property [was] actually repaired or replaced." *Id.* The *Devonshire* court recognized that "no Texas court has employed the doctrine of prevention to vitiate an insured's contractual obligation to repair or replace damaged property before claiming payment for replacement costs," and "in cases where the doctrine has been applied to allow an insured to recover replacement costs, the insurer either completely denied the claim or refused to make any payments until it was too late for the insured, who was frequently an unsophisticated party, to make repairs." *See id.* Commerce argues that in this case, TWIA completely denied the claim; therefore, the doctrine applies.

There is no question in the charge on the doctrine of prevention, and TWIA does not state that it requested a question on the doctrine of prevention. TWIA does not provide any argument supporting a conclusion that the trial court in this case applied the doctrine of prevention, and it does not explain how we may reverse the judgment on this basis

52

even if the trial court applied it. *See* TEX. R. APP. P. 38.1(i). Question 2 presumed that Commerce was entitled to replacement costs and asked the jury to determine the amount it would cost Commerce to replace its roofs. Thus, we conclude that to have preserved this issue, TWIA should have objected to Question 2 on the basis that it improperly applied the doctrine of prevention. *See* TEX. R. CIV. P. 274 ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."); *McLeod v. McLeod*, 644 S.W.3d 792, 809 (Tex. App.—Eastland 2022, no pet.) ("Julie did not preserve error, if any, as to the inclusion of Wanda in these questions because she did not object to the questions on this basis."); *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829 (Tex. 2012) (explaining that to preserve a jury-charge complaint a party must make the trial court "aware of the complaint, timely and plainly, and obtain a ruling." (quoting S*tate Dep't of Highways & Pub. Transp. v. Payn*e, 838 S.W.2d 235, 241 (Tex. 1992))). In addition, TWIA has not met its appellate burden because it has not cited wherein this voluminous record, it made this argument to the trial court or if it obtained a ruling. *See* TEX. R. APP. P. 33.1, 38.1(i). Accordingly, we overrule TWIA's fourth issue to the extent it argues that the doctrine of prevention is inapplicable.

## V.    CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
3rd day of October, 2024.

53